# United States District Court
## for the Northern District of Oklahoma

Case No. 20-cv-649-JDR-SH

BASE FILE

Consolidated with:
Case No. 18-cv-368-JDR-SH

UBIQUITOUS CONNECTIVITY, LP,

*Plaintiff/Counterclaim Defendant,*

*Versus*

CENTRAL SECURITY GROUP – NATIONWIDE, INC.,

*Defendant/Counterclaimant.*

## ORDER ON CLAIM CONSTRUCTION

Plaintiff Ubiquitous Connectivity, LP is the owner of U.S. Patent No. 8,064,935 and U.S. Patent No. 9,602,655, both of which concern inventions that pertain to monitoring and controlling systems within an environment from a remote location. *See* '935 patent at 3:10-30; '655 patent at 3:15-35.[1] Ubiquitous sued Defendant Central Security Group – Nationwide, Inc., which operates under the name Alert 360, for patent infringement. It argues that Alert 360's 2Gig Go! Control Security System infringes claim 12 of the '935 patent and claims 2, 9, and 11 of the '655 patent. The parties dispute the definitions, or constructions, that should be supplied to some of the terms found within those claims. They ask this Court to (1) confirm three agreed-upon constructions supplied by the parties, (2) provide constructions for four

---

[1] Due to the importance of identifying specific language within a patent when construing patent claims, the Court will cite to the patents themselves and the applicable column and line numbers. All other citations utilize CMECF pagination.

No. 20-cv-649
c/w 18-cv-368

disputed claim terms, and (3) determine whether five other claim terms are so ambiguous that they render the claims invalid for indefiniteness.

The Court has reviewed all the evidence and arguments presented in the parties' briefs and presentations at the claim-construction hearing. For the reasons set forth below, the Court adopts the parties' agreed-upon constructions for "command" and "data-bearer service." The Court declines to adopt the agreed-upon definition of "control instruction" and invites the parties to submit an alternative construction for consideration. The Court adopts Alert 360's proposed construction for the claim term "simple message service," and adopts Ubiquitous's proposed construction of "geo-fence." The Court construes "energy conservation command" to mean a "directive to reduce power consumption," and construes "energy conservation mode" to mean "a state in which the base unit sends one or more instructions to conserve power consumption."

I

The Constitution empowers Congress to secure "for limited Times to . . . Inventors the exclusive Right to their respective . . . Discoveries." U.S. Const. art. I, § 8, cl. 8. The purpose of this arrangement is to "bring new designs and technologies into the public domain" by encouraging inventors to disclose their inventions in exchange for being given the right to exclude others from enjoying the invention for a limited period. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 150-51 (1989). In accordance with the power granted to it, Congress has passed numerous laws setting forth the conditions under which an inventor may obtain patent rights, establishing a patent system, and creating the U.S. Patent Office. The Patent Office has been delegated authority to review patent applications, issue patents, and hear and resolve challenges to issued patents, among other things.

Inventors who wish to obtain the exclusive rights available under the Constitution must submit an application describing their invention to the

No. 20-cv-649
c/w 18-cv-368

U.S. Patent Office. The application must include "claims," which are written statements that set forth the outer bounds of the invention. *See Google LLC v. EcoFactor, Inc.*, 92 F.4th 1049, 1054-55 (Fed. Cir. 2024). The Patent Office examines the application to determine whether the criteria for patentability are satisfied. *See generally* 35 U.S.C. §§ 103-105, 112. During the examination process—a back-and-forth exchange between the Patent Office and the inventor's representative—the Patent Office may (and usually does) decide that one or more of the claims within an application cannot mature into a patent. When this happens, the inventor may choose to continue prosecution in one of several ways: For example, the inventor may file a new application seeking to patent a subset of rejected claims or new claims that combine different aspects of the already-described invention (a "continuation" application); alternatively, the inventor may divide the original application into two or more distinct inventions (a "divisional" application).[2]

When an application is granted, a patent issues. That patent gives the inventor the right to exclude others from making, using, selling, offering to sell, or importing the invention as defined—or "claimed"—in the issued patent for a limited period of time.[3] But this right is not inviolable. Under appropriate circumstances, third parties may initiate administrative proceedings seeking the cancellation of one or more claims of an issued patent on the grounds that the claims fail to satisfy the necessary criteria for patentability.

---

[2] Both continuation and divisional applications claim priority to the application from which they arose. This means that we look to the application date of the parent application (or, in some cases, a grandparent or great-grandparent application), and not the application date for the continuation or divisional application, when determining whether one of these types of patents has expired.

[3] The life of a recently filed patent is determined by reference to the filing date of the underlying application. *See, e.g.*, 35 U.S.C. § 154. In some circumstances not applicable here, the life of a patent is determined by reference to the date the patent is granted, or by reference to a disclaimer. *Id.* at §§ 154(c), 254. When the patent expires, so does the patent holder's right to exclude others from practicing the invention.

No. 20-cv-649
c/w 18-cv-368

*See* 35 U.S.C. §§ 311-329.[4] And those who have standing to do so may seek a judicial declaration that one or more of a patent's claims are invalid. These proceedings have the potential to narrow a patent's scope by cancelling one or more of a patent's claims.

## II

The patents at issue in this case share a common lineage: Inventors Charles Shamoon, Deborah Shamoon, Franklin Eugene Neal, and Michael Fehnel filed U.S. patent application no. 11/163,372 in 2005.[5] The inventors filed a division of that application on March 16, 2007. Some of the claims of that divisional application issued as U.S. Patent No. 8,064,935, the older of the two patents-in-suit. Other claims were pursued in a continuation of the divisional application (filed on October 11, 2011), and issued as U.S. Patent No. 9,602,655, the second of the two patents-in-suit. The patents were assigned to Ubiquitous in or around April of 2012.

Ubiquitous sued Alert 360 (and others) for infringement of the '935 and '655 patents in 2018.[6] Alert 360 and another defendant responded by challenging the patents in *inter partes* review proceedings before the Patent Trial and Appeal Board. In January 2021, the PTAB held that, of the forty-six claims collectively set forth in the '935 and '655 patents, forty-two were invalid and unpatentable. The PTAB's decision was affirmed on appeal. Currently, only claim 12 of the '935 patent and claims 2, 9, and 11 of the '655 patent remain in force and effect. Ubiquitous alleges that each of the four

---

[4] Inventors can also initiate review proceedings and may do so to strengthen a patent by amending or adding claims. *See* 35 U.S.C. §§ 301-07.

[5] The history set forth in this paragraph is drawn from the face of the patents and publicly available information concerning the history of the patents-in-suit.

[6] The original complaint filed against Alert 360 was assigned Case No. 18-cv-00368. Ubiquitous filed this action in 2020. The two actions were consolidated in June 2021. *See* Dkts. 32-34, 55.

No. 20-cv-649
c/w 18-cv-368

claims remaining in the patents-in-suit is infringed by Alert 360's 2Gig Go! System. In other words, Ubiquitous argues that each and every element of the four live claims—or equivalents thereof—are present in the 2Gig Go! System. *Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed. Cir. 1985) (stating that, "in order for a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent in the accused device").

### III

Before the finder of fact may address the merits of Ubiquitous's infringement claim, the Court must determine the proper scope and meaning— or, in patent parlance, "construe"—the remaining claims. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (discussing the two-part analysis that begins with construing the claims and ends with comparing the construed claims to the allegedly infringing device or process). By construing the claims, the Court makes a "judicial statement of what is and is not covered by the technical terms and other words of the claims." *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001).

It is not necessary for the Court to construe each and every word used in the claims asserted against Alert 360. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 n.2 (Fed. Cir. 2008). But where a claim term is disputed, or where the meaning of a claim term would not be apparent to the finder of fact, the Court must define the term. *Id.* at 1360. *See United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).

Claim construction is a question of law that is guided by the precedent of the Court of Appeals for the Federal Circuit. *See SunTiger, Inc. v. Sci. Research Funding Grp.*, 189 F.3d 1327, 1333 (Fed. Cir. 1999). That precedent requires district courts to give claim terms the "ordinary and customary meaning" that they "would have to a person of ordinary skill in the art after

No. 20-cv-649
c/w 18-cv-368

reviewing the intrinsic record at the time of the invention."[7] *O2 Micro Int'l*, 521 F.3d at 1360.

The intrinsic record considered by our hypothetical skilled artisan consists of three components: First, the claims, which are set forth in numbered paragraphs following the language "what is claimed is" at the end of the published patent; second, the specification, which describes how the invention works (including specific examples, called "preferred embodiments"); third, the prosecution history, which consists of the prosecution history before the Patent and Trademark Office. *Grace Instrument Indus., LLC v. Chandler Instruments Co., LLC*, 57 F.4th 1001, 1008 (Fed. Cir. 2023).

The starting point of any claim construction is the claims themselves, because it is the claims that define the invention's scope. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). Both differences and similarities in and among claims can inform the meaning of a particular term: In general, "different claim terms are presumed to have different meanings" in the absence of evidence to the contrary. *Helmsderfer v. Bobrick Washroom Eqip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008) (concluding that "partially hidden from view" meant something different than "generally hidden from view"). And because "claim terms are normally used consistently throughout the patent,

---

[7] A person of ordinary skill in the art (sometimes referred to as a POSA, POSITA, or PHOSITA) is a "hypothetical person who is presumed to be aware of all pertinent prior art"—that is, inventions, references, and teachings in the field of and analogous to the claimed invention at the time the invention was made. *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985). *See Netflix, Inc. v. DivX, LLC*, 80 F.4th 1352, 1358-59 (Fed. Cir. 2023) (defining prior art for purposes of determining obviousness). The emphasis is on a person of *ordinary* skill—not great skill, and not (necessarily) the skill exercised by the inventor. *Standard Oil*, 774 F.2d at 454. The question is not what the inventor would have known, understood or done at the time of the invention, as inventors are assumed to "possess something—call it what you will—which sets them apart from the workers of *ordinary* skill. . . ." *Id.* A person of ordinary skill is "presumed to be one who thinks along the line of conventional wisdom in the art and is not one who undertakes to innovate . . . ." *Id.*

No. 20-cv-649
c/w 18-cv-368

the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Phillips*, 415 F.3d at 1314. In addition, where a claim is later narrowed by the introduction of an additional limitation, this will give rise to the presumption that the limitation is not present in the unlimited claim. *Id.* at 1315.

The specification and claims are part of a single, integrated document. *Markman*, 52 F.3d at 979. As a result, the specification is always highly relevant to, and can be dispositive of, a claim's meaning. *Vitronics v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (recognizing that the specification is "the single best guide to the meaning of a disputed term"). Although the specification *informs* the claims, it does not necessarily *limit* them.[8] The purpose of the specification is to teach others how to make or use the claimed invention, and the specification accomplishes this by setting forth particular examples—preferred embodiments—of how a person might practice the claimed invention. But inventors are "not required to describe in the specification every conceivable and possible future embodiment" of their inventions. *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001). If claims were to be limited to the examples provided in the specification "there would be no need for claims." *Id.* (quoting *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc)). Courts should, therefore, hesitate to adopt claim constructions that limit the claimed invention to the disclosed preferred embodiments. *E.g., Pfizer, Inc. v. Teva Pharmaceuticals, USA, Inc.*, 429 F.3d 1364, 1374 (Fed. Cir. 2005). In addition, courts should rarely, if ever, adopt a construction that excludes a preferred embodiment, as doing so would exclude a preferred, disclosed means of practicing the invention from the scope of the patent's claims. *See Vitronics Corp.*, 90

---

[8] There are some exceptions to this rule, such as when an inventor defines a claim term within the specification itself. *See Phillips.*, 415 F.3d at 1316. Those exceptions are not material to this opinion.

No. 20-cv-649
c/w 18-cv-368

F.3d at 1583 (indicating that a construction that excludes a preferred embodiment "is rarely, if ever, correct and would require highly persuasive evidentiary support").

A patent's prosecution history, if it is in evidence, can also inform the court of the meaning of a disputed or ambiguous term. *Phillips*, 415 F.3d at 1317. For example, the patent prosecution history might include statements by the inventor or the Patent Office that will inform the court of how the inventor or the office understood a term. *Id.* While this evidence is often "less useful" than the claims and specification from a claim-construction perspective, the discussions between the inventor and the Patent Office may sometimes establish that an inventor excluded certain interpretations or limited the claimed invention in a particular way. *Id.*; *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384-85 (Fed. Cir. 2005) (recognizing that statements within the prosecution history may have the effect of excluding definitions that were disclaimed by the inventor).

The "intrinsic evidence" comprising the claims, specification, and prosecution history is the first and best evidence of how a disputed term should be construed. "In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term," and a court need inquire no further. *Vitronics*, 90 F.3d at 1583. Where the ambiguity is not resolved, a court may also consider "extrinsic evidence" of how a disputed term should be construed. This evidence may include, for example, expert testimony, inventor testimony, dictionaries, and treatises used by those within the field of the invention. *Phillips*, 415 F.3d at 1317. But this evidence is always "less significant than the intrinsic record in determining the legally operative meaning of claim language";[9] it is "unlikely to result in a reliable interpretation" of a claim unless it is "considered in the context of the intrinsic

---

[9] *Id.* (citation and quotation marks omitted).

No. 20-cv-649
c/w 18-cv-368

evidence";[10] and it can never "contradict the meaning otherwise apparent from the intrinsic record."[11]

## IV

With these controlling principles in mind, the Court now turns to the claims presented for construction. The parties have provided agreed-upon definitions for the terms "command," "data-bearer service," and "control instruction." *See* Dkt. 113 at 1-2. They have provided competing constructions for the terms "simple message service," "energy conservation command," "energy conservation mode," and "geo-fence." The Court will address each in turn.

## A

The parties agree that the term "command," which appears in claim 11 of the '935 patent and claims 1, 2, 9, and 10 of the '655 patent,[12] should be defined to mean "a directive to perform a specific task or operation." Dkt. 113 at 1-2. They also agree that the term "data-bearer service," which appears in claim 10 of the '655 patent, means "a system that allows the transmission of data over a communications network." *Id.* at 2. The Court adopts these constructions, which find support in the intrinsic record.[13]

---

[10] *Id.* at 1319.

[11] *Hemlsderfer*, 527 F.3d at 1382.

[12] Some of the terms presented for construction appear in cancelled claims, including claim 11 of the '935 patent and claims 1 and 10 of the '655 patent. *See* Dkt. 113. Although those claims were cancelled, they are relevant because the remaining live claims are "dependent" on, or incorporate the limitations of, those claims. *See* 35 U.S.C. § 112(d). Claim 12 of the '935 patent depends on claim 11 of that patent; claims 2, 9, and 11 of the '655 patent depend on claim 1 of that patent; and claim 11 of the '655 patent depends on claim 10 of that patent. Dkt. 113. For this reason, construction of terms in claim 11 of the '935 patent and claims 1 and 10 of the '655 patent is proper.

[13] *See* '935 patent, claims 1, 11 (indicating that a "command" has the effect of controlling an operation); '655 patent, claims 1, 2, 9, 10, 12 (describing commands that are for
*(footnote continues)*

No. 20-cv-649
c/w 18-cv-368

The parties jointly propose that "control instruction," which appears in claims 1 and 10 of the '655 patent, should be construed to mean "directions for performing one or more functions and/or operations on an environmental device." The Court has reservations concerning this construction.

Ultimately, the claim constructions adopted by this Court will be provided to the jury along with other instructions governing their deliberations. *E.g., Ecolab, Inc. v. Paraclipse, Inc.*, 285 F.3d 1362, 1369 (Fed. Cir. 2002). The jury will be instructed that it is obligated to apply the Court's construction in its infringement deliberations. *See Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1367 (Fed. Cir. 2004). If the jury is provided with the instruction proposed by the parties, the jury will be required to read claim 1 of the '655 patent as follows:

> A base unit configured to communicate with an environmental device and to communicate with a cellular remote unit having wireless connectivity capable of communicating from a geographically remote location, the base unit comprising:
>
>> a first communication interface configured to receive environmental information from the environmental device and to send a [directions for performing one or more functions and/or operations on an environmental device] to the environmental device;
>>
>> ***
>>
>> a microcontroller configured to process the second message, to provide the [directions for performing one or more functions and/or operations on an environmental

---

or associated with other devices and give rise to "control instructions"); '655 patent, claim 10 (indicating that a "data-bearer service" may be included in a cellular communications network). *See also, e.g.,* '935 patent at 2:11-15, 2:30-35, 6:50-65, 7:20-23 (supporting the conclusion that a "command" is a direction that causes a response); '655 patent at 6:60-7:7, 7:34-40, 8:13-23, 11:27-31 (same); '655 patent at 3:58-4:7 (using "data bearer" to describe a service of a "cellular telephone network").

No. 20-cv-649
c/w 18-cv-368

device] based on the command, and to send the [directions for performing one or more functions and/or operations on an environmental device] to the environmental device via the first communication interface, and

\*\*\*

wherein the [directions for performing one or more functions and/or operations on an environmental device] to the environmental device is associated with the command for the base unit, wherein the cellular remote unit is configured to determine position data of the cellular remote unit, and determine when the cellular remote unit is outside a geo-fence, wherein the cellular remote unit is configured to transmit a notification via a simple message service responsive to determining that the cellular remote unit is outside of the geo-fence.

'655 patent, claim 1 (alterations added to reflect proposed construction).

This construction is not helpful. As a preliminary matter, the term "control instruction" is singular when it is used in the claims, but the proposed construction is plural. This impairs the readability of the claim, as demonstrated by the construction above.

Second, although the parties agree that the definition for "control instruction" should include the term "environmental device," the parties cannot appear to reach an agreement on what an "environmental device" is. Thus, the proposed construction fails to provide a complete, agreed-upon definition for "control instruction," leaving the phrase open to further interpretation. Under the parties' construction, the jury will be forced to define "control instruction" once, then define it again based on the Court's construction of the term "environmental device."

Third, as construed above, claim 1 includes the phrase "directions for performing one or more functions and/or operations on an environmental device to the environmental device." This phrase invites confusion. Must the

11

No. 20-cv-649
c/w 18-cv-368

instruction for operations on "an" environmental device be performed on "the" environmental device? Or can "the" environmental device receive instructions for operations on another, different environmental device? The answer to this is not clear from the intrinsic evidence, as the term "control instruction" is used only in the claims, which do little to clarify the term other than to establish that, at least in the inventor's mind, a "control instruction" can be based on, associated with, or the product of a "command," can be configured to adjust the temperature of a water heater or an air handling system, and can include "an environmental control instruction." '655 patent, claims 1, 4, 5, 8, 10, 12, 18, 24.

Finally, the proposed construction for "control instruction" is substantively identical to the agreed instruction for "command." The Court sees little basis for distinguishing the two terms. The parties' proposed definition leaves the Court (and may leave the jury) left to wonder how a "command" differs from a "control instruction." *See, e.g., CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) (explaining that "[i]n the absence of evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings"). The parties' proposed construction leaves the Court with more questions than clarity. Accordingly, the Court declines to adopt the parties' construction of "control instruction" at this time. Because this is an agreed instruction, the Court will grant the parties leave to propose alternative instructions, either jointly or individually.

B

Although the parties nominally disagree about the appropriate construction of "simple message service," which is found in claim 1 of the '655 patent, they both agree that the term is synonymous with "short message service (SMS)." *See* Dkt. 113 at 2-3. The agreed portion of the definition finds ample support within the specification, which uses "simple message

12

No. 20-cv-649
c/w 18-cv-368

service," "short message service," and "SMS" interchangeably. *See* '655 patent at 3:8-14 (using SMS to mean "short message service"); *id.* at 7:22-24 (using SMS to mean "simple message service"). The Court therefore agrees with the parties that "simple message service" means, at a minimum, "short message service (SMS)."

The parties' only disagreement with respect to this term is whether the term "simple message service" should be defined to include not only "short message service (SMS)," but also "equivalents" thereof. *See* Dkt. 113 at 2-3. Ubiquitous argues that the term "or its equivalent" should be added to the Court's construction. In support of this contention, Ubiquitous notes that the jury will be asked to determine whether a term "or its equivalent" can be found in the accused device, and that incorporating the phrase "or its equivalent" is an appropriate, accepted practice that should be adopted in this case. Dkt. 105 at 13-14.

The Court disagrees with Ubiquitous. It is not necessarily true that the jury will be instructed to determine whether "equivalents" of a claim term can be found in the accused device. In general, a jury determines infringement by comparing the allegedly infringing device (in this case, the 2Gig Go! System) to the asserted claims. If all elements of the claim are literally present, the accused product infringes the claim, and the only remaining question is that of damages. *See Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 607 (1950) (stating that, if "accused matter falls clearly within the claim, infringement is made out and that is the end of it"). But courts have recognized that would-be copyists have attempted to avoid liability by making "unimportant and insubstantial changes" that add nothing to the invention but are sufficient to "take the copied matter outside the claim, and hence outside the reach of law." *Id.* The doctrine of equivalents, which was created in response to this practice, permits a patent holder to pursue claims concerning products that, while they do not literally infringe, nevertheless perform

No. 20-cv-649
c/w 18-cv-368

"substantially the same function in substantially the same way to obtain the same result" as the claimed invention. *Id.* at 608 (quoting *Sanitary Refrigerator Co. v. Winters*, 280 U.S. 30, 42 (1929)).

A jury should not be instructed on the doctrine of equivalents in every case; rather, it is only when the patent holder has presented particularized evidence and argument "explicitly setting forth equivalence of result, function, and means" that the jury may be instructed on that doctrine. *See Lear Siegler, Inc. v. Sealy Mattress Co. of Mich.*, 873 F.2d 1422, 1426 (Fed. Cir. 1989) (stating that, "since there was neither argument nor evidence explicitly setting forth equivalence of result, function, and means, the trial court should not have instructed the jury on the doctrine"); *Nestier Corp. v. Menasha Corp.-Lewisystems Div.*, 739 F.2d 1576, 1580 (Fed. Cir. 1984) (concluding that the district court's decision not to include an instruction on the doctrine of equivalents was supported by the record, which failed to form a basis for analysis of equivalence).

The Court has reviewed two of the opinions that, according to Ubiquitous, demonstrate that it is "common" to include the phrase "or its equivalent" at the end of a construction. Dkt. 105 at 14. One is distinguishable because it involves a "means-plus-function" limitation, a special type of claim limitation that is "expressed as a means or step for performing a specified function" and is construed to cover all "corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112(f). *See Citec, Inc. v. Romtec, Inc.*, Civ. A. No. RDB-02-3355, 2003 WL 25783117, at *6 (D. Md. Dec. 8, 2003) (recognizing that the limitation "reset means" is expressed in "means plus function" language).[14] The other

---

[14] This citation is somewhat different than the one supplied by Ubiquitous, but it contains the same language and is identified by the same case number as the provided exhibit. The court and date differ. If Ubiquitous intended to refer to a different case, it may

*(footnote continues)*

No. 20-cv-649
c/w 18-cv-368

contains no explanation about why the limitation "or its equivalent" was proposed by the party or adopted by the court. *Hayes Lemmerz Int'l, Inc. v. Kuhl Wheels, LLC*, No. 03-cv-70181-DT, 2007 WL 1219043, at *7 (E.D. Mich. Apr. 25, 2007).[15] These cases, without more, fail to demonstrate that the Court should construe the phrase "simple message service" to include "equivalents" at this stage of the proceedings.

The current record does not allow the Court to make a determination regarding the applicability of the doctrine of equivalents and, in any event, this is not the time for making such a determination. If Ubiquitous presents the evidence and arguments necessary to support an instruction on the doctrine of equivalents it may, perhaps, offer a proposed instruction on that doctrine.[16] Ubiquitous may not, however, attempt to make an end-run around its obligations to present the evidence and arguments required in *Graver Tank* by introducing an "or its equivalents" limitation at the claim construction phase. The Court therefore declines to adopt Ubiquitous's proposed limitation. The term "simple message service" is construed to mean "short message service (SMS)."

## C

The parties next dispute how the terms "energy conservation command" and "energy conservation mode" should be construed. Ubiquitous argues that "energy conservation command" means "a directive to perform

---

notify the Court by supplying a copy of the opinion or an updated citation that includes a Westlaw or Lexis identifier.

[15] Ubiquitous has not explained whether or how the third opinion, which is the product of an *inter partes* review proceeding before the PTAB, is applicable or analogous to a district court's analysis.

[16] This is not guaranteed. Another court has recently held that the doctrine of prosecution history estoppel precludes Ubiquitous from asserting infringement by equivalents. *See Shamoon v. City of San Antonio*, No. SA-18-cv-00718-XR, 2025 WL 1356399, at *5 (W.D. Tex. Apr. 30, 2025).

No. 20-cv-649
c/w 18-cv-368

a specific task or operation for the intended purpose of reducing power consumption," and "energy conservation mode" means "a state or status for the operation of one or more devices for the intended purpose of reducing power consumption." Dkt. 113 at 3-4. Alert 360, in contrast, argues that "energy conservation command" means a "command to reduce power consumption," while "energy conservation mode" means a "state of reduced power consumption."

Although the parties nominally differ on how the words "command" and "mode" should be interpreted,[17] the crux of their dispute concerns the term "energy conservation." Specifically, the parties disagree about whether the claims require actual energy conservation, or whether the claims require only that steps be taken with the intent to conserve energy. Ubiquitous argues that the "intended purpose" requirement is necessary because nothing in the specification requires that the system *actually* conserves power or energy; according to Ubiquitous, it is enough if a mode is entered or a command is given "for the intended purpose of reducing power consumption." Dkt. 105 at 16-17 (arguing that the patents "do not require that power is reduced, only that the proper type of command is sent"). Alert 360, however, points out that there is no support in the specification or anywhere for the "intended purpose" requirement, and argues that its constructions reflect the clear, ordinary, and customary meaning of "energy conservation." Dkt. 103 at 20-22.

The Court agrees with Alert 360 that the phrase "intended purpose" is not supported by intrinsic evidence. The phrase "intended purpose" does

---

[17] The Court notes that the term "command" has already been construed by agreement. *See* Section IV A, *supra*. Alert 360 uses "command" in its proposed construction, while Ubiquitous substitutes the agreed-upon construction for that term. They appear to agree that a "mode" is a "state," but disagree over whether it may also be a "status." *See* Dkt. 113.

No. 20-cv-649
c/w 18-cv-368

not appear anywhere in the claims or specification.[18] Moreover, there is nothing to suggest that a "mode" is defined by or limited to its "intended purpose": During the few instances where the claimed "energy conservation mode" is discussed, it is discussed by reference to the operations actually performed once that mode is entered, rather than by the intent behind the mode. *See* '655 patent at 7:6-11 (describing actions such as adjusting air handling systems, opening and closing dampers, opening or closing window coverings, and adjusting the operation of a hot water heater).[19]

In a similar vein, nothing in the specification suggests that a "command" should be defined by the intent behind it. The term "command" appears thirty-eight times in the '935 patent and thirty-four times in the '655 patent; the terms "intent" and "intend" never do. Rather than referring to a "command" by reference to an "intended purpose," the specifications consistently use the term "command" to refer to the type of direction or instruction that results in an action.[20] Moreover, the term "command" should be construed consistently throughout the patent, *see Phillips*, 415 F.3d at 1314, and the parties have already agreed that "command" is "a directive to perform a specific task or operation," not a "directive made with the intent that

---

[18] The term "purpose" appears four times in both patents, but never in connection with a "command" or a "mode." *E.g.*, '935 patent at 2:55-58, 5:1-4, 5:58-64, 6:27-29; '655 patent at 2:62-65, 5:10-13, 6:1-7, 6:37-39.

[19] The term "mode" is used only three other times in the specification of the '655 patent: Once to describe the "most basic mode" of a cellular phone, *see* '655 patent at 3:5-8, once to describe the "conventional mode" of a cellular telephone, *id.* at 7:16-20, and once to clarify that a communication does not involve "voice mode for communicating between . . . two units," *id.* at 7:46-48. These other uses are of no help to Ubiquitous, as they appear to use the term "mode" to refer to the actions that are taken, or can be taken, when a mode is entered, rather than the intent to achieve a certain result by entering a mode.

[20] *See, e.g.*, '655 patent at 6:63-7:11 (indicating that, upon receiving a "command" to enter energy conservation mode, the base unit "enter[s]" that mode and adjusts systems and operations "to conserve power consumption of the home"); *id.* at 11:27-37 (indicating that the base unit "commands the cellular module to send newly received SMS messages").

No. 20-cv-649
c/w 18-cv-368

a specific task or operation be performed." *See* Dkt. 113 at 1-2. It would be an odd result to apply an intended purpose limitation to the term "command" when the command concerns "energy conservation," but not in other cases.[21]

In view of the foregoing, the Court concludes that the "intended purpose" limitation proposed by Ubiquitous lacks intrinsic support and creates inconsistencies with respect to other, agreed-upon terms. Accordingly, the Court declines to adopt that limitation with respect to either "energy conservation command" or "energy conservation mode."

Although the Court has rejected Ubiquitous's proposed constructions, the Court is not required to accept Alert 360's definitions by default. *See Yoon Ja Kim v. ConAgra Foods, Inc.*, 465 F.3d 1312, 1319 (Fed. Cir. 2006) (recognizing that a court may "adopt claim constructions which have not been proposed by either party" but "should be hesitant to do so"). It is not the Court's job to decide "which of the adversaries is correct"; instead, the Court "must independently assess the claims, the specification, and if necessary the prosecution history, and relevant extrinsic evidence, and declare the meaning of the claims." *Exxon Chem. Pats., Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1556 (Fed. Cir. 1995).

The Court concludes that Alert 360's proposed construction of "energy conservation command" is generally consistent with the specification and claims. The term "energy conservation command" appears in claims 9 and 11 of the '655 patent. The claims require that this type of "command" be something that is capable of being included in a message received by a base unit and associated with "multiple environmental devices" (whatever those

---

[21] *See* '935 patent, claim 1 (claiming a command "to control the operation of the environmental device"); '655 patent, claim 1 (claiming a "command regarding the environmental device").

No. 20-cv-649
c/w 18-cv-368

are).[22] *See* '655 patent, claims 1, 9, 11. The claims therefore suggest the command must be one of a high level of generality that can be transmitted to and processed by one or more "environmental devices." A command "to reduce power consumption" fits that bill, and is consistent with the specification, which describes various ways that such a command might be carried out. *See* '655 patent at 10:33-50. Accordingly, the Court adopts Alert 360's proposed construction with a slight modification: Because the parties agree that a "command" is "a directive to perform a specific task or operation" the Court construes "energy conservation command" to mean a "directive to reduce power consumption."

The Court has some reservations with respect to Alert 360's contention that an "energy conservation mode" is a "state of reduced power consumption." The Court is sympathetic to Ubiquitous's argument that this appears to require an actual reduction in power consumption—a requirement that is not supported by either the claims or the specification.[23] In "energy conservation mode," commands are issued and systems are modified "to conserve power consumption in a home." *See* '655 patent at 7:2-11. But it does not necessarily follow that energy will be conserved. For example, a user of the claimed system might specify that, in energy conservation mode, the curtains of his west-facing windows should be closed between the hours of 10a.m. and 4p.m. This instruction, if followed, might conserve energy in the warmer months; it might not do so on sunny days during cooler months.

---

[22] The specification provides little if any clarity about what an environmental device is, and the examples of what might fall within this term vary significantly. *Compare* '655 patent at 9:27-39, *with id.* at 12:19-24.

[23] This problem does not arise with respect to "energy conservation command," as a "command to reduce power consumption" may be issued without resulting in an actual reduction in power consumption.

No. 20-cv-649
c/w 18-cv-368

In the Court's estimation, the easiest way to construe "energy conservation mode" would be to instruct the jury to give that term its plain and ordinary meaning. The term is a common one that most jurors would have little difficulty understanding. But the parties have requested a construction, so the Court must provide one. *See O2 Micro Int'l*, 521 F.3d at 1360 (indicating that, when there is an "actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute").

The intrinsic evidence provides the following guidance: The claims require that an "energy conservation mode" is something that can be "entered." '655 patent, claim 2. This is consistent with the parties' agreement that an "energy conservation mode" is a "state." Dkt. 113. Further, the claims require that the "energy conservation mode" be associated with "multiple environmental devices." '655 patent, claim 2.[24] That is the only clarification provided by the claims. The specification indicates that, once "energy conservation mode" is entered, the base unit[25] may, for example, send control instructions to air handling systems, dampers, window coverings, and water heaters "to conserve power consumption of the home." *Id.* at 7:4-11.

In view of this evidence, the Court concludes that the claimed "energy conservation mode" is a "state in which the base unit sends one or more instructions to conserve power consumption." This construction addresses Ubiquitous's concern regarding the impropriety of requiring an actual reduction in power, and it does so without impermissibly ascribing intent to a command. It is drawn, as much as possible, from the specification itself, and is

---

[24] It might also be associated with other things, but the affiliation with "environmental devices" is required.

[25] As described in claim 1, the base unit includes, among other things (a) an interface configured to receive a message containing a command from a cellular remote unit, and (b) an interface configured to send a control instruction to one or more environmental devices. *See* '655 patent, claim 1.

No. 20-cv-649
c/w 18-cv-368

consistent with the requirements of the claims. The Court recognizes, how-
ever, that the construction is lengthy, it incorporates an already existing claim
term, and it was not proposed by either party. Accordingly, the Court will give
the parties an opportunity to provide objections and alternatives to this pro-
posed construction.

D

The final term for which the parties provide competing constructions
is "geo-fence," which is found in claim 1 of the '655 patent. The parties agree
that a geo-fence is a "virtual boundary or perimeter around" something, and
this much is supported by the intrinsic evidence. *See* '635 patent at 8:55-67,
9:20-27. Their primary disagreement concerns whether that boundary may
be around *any* "physical location," as proposed by Ubiquitous, or whether it
must be "around the base unit" and "defined by a limit on the distance be-
tween the geographic location of a cellular remote unit and the geographic
location of the base unit," as proposed by Alert 360. Dkt. 113 at 5.

Ubiquitous's argument is the correct one. The claim itself does not
provide any specific limitations regarding the location of the geographic
boundary. *See* '655 patent, claim 1. The specification does describe a bound-
ary defined by the base unit's location, *see id.* at 9:1-14, but this is nothing
more than an example of how the invention might be practiced. It would be
improper to limit the scope of claim 1 based on this example. *See Teva Phar-
maceuticals*, 429 F.3d at 1374. Furthermore, the specification indicates that the
geographic location of the base unit is something that may be "entered" by
the user for purposes of determining whether a remote unit has travelled out-
side the geo-fence. '655 patent at 9:1-14. One of ordinary skill in the art—and
even a highly motivated teenager—could easily see that the boundaries of the
geo-fence could be established or modified by entering location data that dif-
fers from the actual location of the base unit. Alert 360's construction is

No. 20-cv-649
c/w 18-cv-368

unduly limiting, and the Court construes "geo-fence" to mean a "virtual boundary or perimeter around a physical location."

## V

The remainder of the parties' disputes concern not the construction of the five remaining disputed claim terms, but the validity of those terms. Alert 360 argues that five claim terms are indefinite because the claims, when read in light of the specification and prosecution history "fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). Ubiquitous argues that the claims are definite, proposes constructions for each term, and argues that the Court should not rule on the validity of the patents' claims until later in the proceedings.

The Court will defer ruling on the validity issue. The term "control instruction" has not been construed in accordance with the parties' joint proposal, and that term is a component of one of the terms that Alert 360 argues is indefinite. If the parties accept this Court's invitation to propose an alternative construction, that construction may affect the Court's analysis. The parties' arguments concerning the constructions created by the Court may also affect the Court's invalidity analysis. Accordingly, the Court takes the parties' arguments regarding invalidity under advisement and will address those arguments at a later date.

## VI.

For the reasons set forth in this opinion, the Court adopts the following constructions with respect to the disputed claims:

A.    A "command" is a "directive to perform a specific task or operation";

B.    A "data-bearer service" is a "system that allows the transmission of data over a communications network;

No. 20-cv-649
c/w 18-cv-368

C.    A "simple message service" is a "short message service (SMS)";

D.    An "energy conservation command" is a "directive to reduce power consumption";

E.    An "energy conservation mode" is a "state in which the base unit sends one or more instructions to conserve power consumption"; and

F.    A "geo-fence" is a "virtual boundary or perimeter around a physical location."

The Court declines to adopt constructions for the remaining claims at this time. If the parties wish to do so, they may provide a revised construction of "control instruction" and their respective positions regarding the claim constructions of the Court's creation within thirty days of this Order.

DATED this 20 day of May 2025.

JOHN D. RUSSELL
*United States District Judge*